In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1432

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL J. DIEKHOFF,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 05-CR-10003—**Michael M. Mihm**, *Judge.*

———————

ARGUED FEBRUARY 28, 2008—DECIDED JULY 24, 2008

———————

Before FLAUM, MANION, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Defendant-appellant Michael Diekhoff appeals his convictions below for kidnapping in violation of 18 U.S.C. § 1201(a), using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c), and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Following his convictions, the judge sentenced him to life imprisonment as to the first count with concurrent sentences for the remaining two. The only real issue below was Diekhoff's sanity, and, here on appeal, Diekhoff appeals the district court's handling of this defense on a number of grounds. Finding no error, we affirm.

## I. Background

In 2004, Diekhoff lived in Westmont, Indiana but worked for a Bloomington, Illinois trucking company as an over-the-road trucker. There, he met and befriended one of the company's dispatchers, Lori Wagner. Although Wagner and Diekhoff were never romantic, the two were friendly—meeting for dinner every month and, after Diekhoff left the company, visiting each other periodically. In August 2004, Wagner began dating the man who would become her future husband. Wagner and Diekhoff still spoke on the phone, but their monthly visits became a thing of the past. In mid-October 2004, Diekhoff called Wagner to tell her that, in light of her emerging romance, he would not be calling her any more.

Then strange things began happening to Wagner. On October 28, 2004, someone set her house on fire, causing a good deal of property damage and killing two of her cats. In early November, someone dumped yellow paint on her car, and a woman—whom Diekhoff had paid—called that night asking if she had seen the damage to her car. This anonymous woman would call again a few weeks later, reading a script that Diekhoff had given her. She told Wagner to "leave the country" and said that the property damage to her car and home would pale in comparison to what would happen to her children. Police tracked the phone calls to Indiana. And when Wagner told the police that Diekhoff lived there, the police paid him a visit. Following his interview, Diekhoff called Wagner to tell her that two "FBI agents" had visited him to investigate her case. Then the phone calls stopped; three weeks of police surveillance of Wagner's work place did not reveal any suspicious activity.

Wagner would not hear from Diekhoff again until the morning of January 6, 2005, when he approached her in

her work parking lot wearing a mask and sporting a shotgun. Diekhoff pointed the gun at her and hustled her into a minivan he had rented. When Wagner fought back, Diekhoff threatened to shoot her and dragged her into the minivan by her hair. There, the struggle continued until Diekhoff pointed the gun to Wagner's head and told her he "had no problem blowing her brains out right here and now." Subdued, Wagner was handcuffed to a chain around the driver's seat, and the two drove west.

Diekhoff was clearly agitated. His mother, with whom Diekhoff lived, would testify at trial that prior to the kidnapping he had stopped working and stayed by himself in his bedroom for hours on end. She described him as nervous and paranoid; he lost a good deal of weight and had taken to talking to himself. Driving west in the minivan, Wagner got a sense of Diekhoff's problems and learned the story behind her two months of harassment. He said that he had started the fire at her house because he wanted to hurt her, and he had paid a woman $100 to make the harassing phone calls. Diekhoff had also spied on her and her boyfriend on one occasion, watching them in her home. He told Wagner that he would have killed them both if he had a gun at the time.

Diekhoff also said that he still wanted to hurt Wagner a few times during the drive. At one point, Diekhoff gave Wagner forty-five minutes "to convince him that [she] was human, that [she] deserved to live." And at another, he told her that he was going to kill her and "put [her] in the tall weeds" for apparently lying to him. After passing from Illinois to Iowa, Diekhoff stopped the minivan and told Wagner to call someone to say that she was fine and was on her way to Colorado. After Wagner fed this story to her boss at the trucking company, Diekhoff called his

mother in Indiana. At this point, the police were aware of the kidnapping, and they had found Diekhoff's suicide note after searching his room. Diekhoff told his mother that he was going to Colorado with Wagner; in light of the note, his mother told him he should just let Wagner go and come home.

But Diekhoff kept driving—from Iowa through to South Dakota. Over the next two days, Wagner attempted to placate Diekhoff by agreeing with everything he said. The tactic eventually worked. Diekhoff let Wagner call her daughter at one point. And eventually he grew to trust her, so much so that when the two stopped at a gas station in South Dakota Diekhoff left Wagner alone in the car. Seizing the opportunity, she drove away and called the police, who soon captured Diekhoff. A search of the minivan revealed water, boots, binoculars, camouflage pants, and a clutch of incriminating equipment: the loaded shotgun, shotgun shells, duct tape, and packaging for the face mask.

A three-count indictment and Diekhoff's arraignment followed. At his arraignment, the district court ordered a psychological exam to determine whether Diekhoff was competent to stand trial. Following the examination, the district court found Diekhoff to be incompetent and ordered him confined in a treatment facility until his competency was restored. Following his treatment, the district court eventually concluded that Diekhoff was competent and, when Diekhoff pled not guilty by reason of insanity, set the case for trial.

Prior to trial, the government informed Diekhoff that it would seek to admit evidence related to two prior felony convictions for attempted manslaughter and confinement. Both stemmed from incidents in 1987 involv-

ing Diekhoff's girlfriend at the time, Tina Hoeing. Hoeing and Diekhoff had dated briefly from late 1986 until the spring of 1987, when Hoeing broke things off. Soon afterwards, the police arrested Diekhoff when he fired a gun at Hoeing's head. Then, when he was out on bond, he broke into Hoeing's home. He forced Hoeing and her fifteen-year-old brother out at gunpoint, making the latter drive them away in Hoeing's car. After a brief stop at his own car—where he grabbed a duffel bag filled with chains, duct tape, cash, and a handgun—he left Hoeing's brother behind and took Hoeing to an Indianapolis hotel, handcuffed and covered in a tarp. Diekhoff held her captive until the next night when the police found and freed her. The government soon charged him with attempted murder—for firing the gun at Hoeing's head—and confinement—for kidnapping Hoeing and her brother. A jury would find him guilty but mentally insane as to the attempted murder charge, and a separate jury would find him guilty of the confinement charge. For all this, Diekhoff served time in prison, eventually earning his release in 2001. After the parties briefed the issue, the district court allowed the government to present evidence related to the confinement offense, but not the attempted murder offense. The court said that it was a "close call," but added that the evidence was "relevant and probative on the matter of the defendant's state of mind, his intent." The court went on to reason that "under these circumstances which involve a claim of insanity at the time of the conduct," it did not consider the prejudice to be "unfair" and held that the evidence would be admissible.

At trial, the only issue was Diekhoff's sanity. The government put on twelve witnesses in its case-in-chief, including Wagner, the police officers involved in the

offense, as well as Hoeing and two officers involved in her case. In his defense, Diekhoff presented the testimony of his mother and that of Dr. Robert Chapman. The latter would testify that Diekhoff suffered from "major depression, recurrent type," which causes "hopelessness, helplessness, and despair." In his opinion, this defect would cause "impaired judgment," though he conceded on cross-examination that this did not necessarily mean Diekhoff could not understand the wrongfulness of his actions.

To rebut Dr. Chapman's testimony, the government presented the testimony of two doctors who had examined Diekhoff after he was declared competent but prior to trial. The first, Dr. Ralph Newman, was a psychiatrist who agreed that Diekhoff suffered from a "major depressive disorder." But, in his opinion, this disorder would have "no correlation [with] unlawful behavior." The second, Dr. Adeirdre Stribling, was a staff psychologist at the Bureau of Prisons who had interviewed Diekhoff prior to trial. Dr. Stribling also agreed that Diekhoff suffered from a "major depressive disorder" and a "personality disorder." In her opinion, Diekhoff suffered from the latter but not the former during the kidnapping: Someone with a "major depressive disorder" would have an impaired "ability to function on a day-to-day basis" and could not "plan or execute higher level tasks." The government then asked Dr. Stribling about the specifics of her conversations with Diekhoff concerning the kidnapping. She recalled his statement from her notes, over Diekhoff's objection, "When I kidnapped the girl, I needed help. I knew it was wrong. It was also wrong for me to want to kill myself and I'm sorry."

On cross-examination, Diekhoff's counsel asked Dr. Stribling to read the notes from her interview with

Diekhoff in their entirety. In response, she read a state-
ment Diekhoff had given her:

> When they say I kidnapped the girl, I actually didn't
> know if I could make it another day. I just felt like
> I didn't want to go on. I just wanted to visit three
> states before I killed myself. I just brought her along
> for the ride. I wanted to make the whole trip, drive to
> the end, drop her off at home, then shoot myself.
> I knew it was wrong to take her with me like that, so
> I tried to let her use the phone along the way during
> the trip. It was more problems than that because by
> then it was a kidnapping. That was wrong. But it
> was also wrong for me to want to kill myself. Now
> I'm on the medication and it is important that I live.
> I don't know how long I will be in prison. They could
> just give me time served. I was wrong and I'm sorry.

The parties would come to dispute the third- and second-
to-last sentences of this statement. When the time came to
tender jury instructions, Diekhoff offered one that read:

> If the Defendant is found Not Guilty By Reason of
> Insanity, The Court will commit the Defendant to a
> suitable facility until he is eligible for release under the
> law.

He claimed that this instruction was necessary to counter-
act Dr. Stribling's testimony recounting his statement—
specifically the statements that he "didn't know how
long [he] will be in prison" and that "They could just
give [him] time served." Diekhoff's counsel thought this
was misleading; the jury could convict despite a belief
that he was insane simply because it did not want to see
Diekhoff walking the streets. But the judge disagreed,
stating first that the statement was of the defendant's own

doing and, more importantly, that there was no "inaccurate or misleading information of the type that the instruction contemplates." The jury convicted Diekhoff on all three counts, and the judge sentenced him to life for the kidnapping, a ten-year concurrent sentence for the use of a firearm, and a seven-year concurrent term for the felon-in-possession charge. This appeal followed.

## II.  Discussion

Diekhoff raises three evidentiary issues on appeal related to the admission of testimony regarding his prior offenses, the content of Dr. Stribling's testimony, and the district court's denial of a requested jury instruction. The following sections discuss each in turn.

### A.  Admission of Rule 404(b) Evidence

Diekhoff first challenges the district court's decision allowing the government to present evidence of his previous kidnapping conviction, arguing that it was impermissible propensity evidence. Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." FED. R. EVID. 404(b). This Court has set up a four-part test for examining potential propensity evidence, which combines the proscription laid out in Rule 404(b) with the more general foundation, relevancy, and prejudice requirements defined elsewhere. *See* FED. R. EVID. 402, 403; *see also United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir. 1984), *overruled in part on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988). Thus, courts are to examine whether

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice.

*United States v. Simpson*, 479 F.3d 492, 498 (7th Cir. 2007). Diekhoff challenges the district court's decision to admit the evidence on the basis of the first and fourth prong, a decision we review for an abuse of discretion. *United States v. Thomas*, 321 F.3d 627, 630-31 (7th Cir. 2003).

Diekhoff's first claim is that the admission of the testimony regarding his previous kidnapping and burglary convictions did not "establish[ ] a matter in issue other than [his] propensity to commit the crime charged." Below, the district court admitted the evidence under the theory that it was relevant to Diekhoff's "state of mind, his intent," not his propensity to have committed the crime. Diekhoff raises two broad challenges to these theories of admissibility. First, Diekhoff claims that the government never really pinpointed a theory of relevancy below and, in his estimation, it was reversible error for the district court not to require that it do so. This argument has little support in the record. In September 2006, the parties discussed the admissibility of Diekhoff's prior crimes. During that hearing, the government pressed for the admission of both the prior attempted manslaughter and kidnapping charges under the theory that it proved "intent, knowledge, plan." The court then denied the request as to the admission of the attempted manslaughter offense

and ordered supplemental briefing as to the kidnapping charge. In its brief, the government argued that the evidence was still relevant despite Diekhoff's insanity plea to show that he appreciated the wrongfulness of his actions, the central issue at trial. And the court then admitted the evidence to bear on Diekhoff's "state of mind [and] his intent." In sum, there is no basis for concluding, as Diekhoff urges us to do, that the government was reciting by rote the admissible purposes listed in Rule 404(b) without tying that theory to the case. On the contrary, both the district court and the government were careful to examine the admissibility of this evidence in light of Diekhoff's insanity defense.

Diekhoff's principal argument, however, is that the evidence showed nothing but his propensity for criminal behavior. He submits that his intent and state of mind were not at issue because he stipulated to having kidnapped Wagner. And, he claims, his intent had little relevance in establishing whether he could tell the difference between right and wrong. We disagree.

The only issue in this case was Diekhoff's state of mind: whether he appreciated the wrongfulness of kidnapping Wagner. And the evidence presented by the government bore directly on this issue. Specifically, it tended to show that Diekhoff was aware of the wrongfulness of his behavior. *See United States v. Ewing*, 494 F.3d 607, 616 (7th Cir. 2007) ("[A] defendant's knowledge that his conduct was illegal may be taken into account when determining his ability to appreciate its wrongfulness."); *see also United States v. Ruster*, 712 F.2d 409, 412 (9th Cir. 1983). The fact that Diekhoff had committed a similar kidnapping offense in the past made it more likely that he understood that the activity underlying the charged offense was

wrong as well. *See United States v. Bradshaw*, 935 F.2d 295, 301 (D.C. Cir. 1991); FED. R. EVID. 401 (defining relevance). In addition, the prior conviction showed that he was mentally capable of planning a complicated criminal act. *United States v. Brown*, 785 F.2d 587, 591 (7th Cir. 1986). Diekhoff's ability to "organize and orchestrate," *id.*, was directly relevant to Diekhoff's alleged "mental disease or defect." And the fact that he had executed a complicated kidnapping before made it more probable that he had an ability to plan—an "awareness of the world surrounding him," *id.*—that belied insanity. He was free to argue that his mental state had deteriorated from the date of the last offense. But this counter-argument does not preclude admissibility.

Lastly, Diekhoff argues that the probative value of this evidence was "substantially outweighed by the danger of unfair prejudice." We review the district court's balancing of these factors below deferentially, asking only whether it abused its discretion. *United States v. Bramlet*, 820 F.2d 851, 857 (7th Cir. 1987). And because the court did not, we agree with its conclusion. The probity of his previous offense dovetails with the theories of relevance just discussed; "a prior criminal record for similar acts is highly relevant to the basis for and the reliability of witnesses' testimony about the defendant's appreciation of the unacceptability of his conduct." *Bradshaw*, 935 F.2d at 302; *Ruster*, 712 F.2d at 412. And although the evidence was certainly prejudicial, it was not unfairly so. Propensity evidence poses the risk of unfair prejudice when it will likely "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *United States v. Coleman*, 179 F.3d 1056, 1062 (7th Cir. 1999). The danger of unfair prejudice

is lessened somewhat in a case where the only issue is the defendant's sanity. The act itself is uncontested. So it is unlikely that the jury would convict solely based on a desire to put away a dangerous person regardless of his actual involvement in the crime charged. More importantly, however, the prejudice from a showing of prior criminality would not likely interfere with the jury's assessment of the proof in the case before it. The question is whether the defendant knew right from wrong. And the evidence of the defendant's prior criminal acts is not likely to unfairly tilt the jury towards a conclusion that he did. The evidence here tended to show that Diekhoff had the capacity to plan complicated criminal acts and knew that his actions were wrong. But prior criminal acts could just as easily show the defendant's insanity. *Bradshaw*, 935 F.2d at 302 ("[T]here is the possibility that an extensive criminal record will prove prejudicial to the government by permitting the inference that the defendant is insane either because he cannot appreciate the nature of his acts or because he continues to commit the same crime for which he has consistently been punished in the same easily-detectable way."). In short, the prejudice when only the defendant's sanity is at issue does not cut unfairly in the direction of sanity. Thus, given the high probative value and the low risk of prejudice, the district court did not abuse its discretion in admitting the evidence.

### B. Dr. Stribling's Testimony

Diekhoff also argues that the district court erred in allowing Dr. Stribling to testify as to certain parts of her conversations with him. In the course of her testimony, the government asked Dr. Stribling—testifying as an

expert—to "tell us what [Diekhoff] told you the best that you can recall." Dr. Stribling's response was that Diekhoff had said "When I kidnapped the girl, I needed help. I knew it was wrong. It was also wrong for me to want to kill myself and I'm sorry." Diekhoff claims that this testimony violated Federal Rule of Evidence 704(b) because it constituted expert opinion as to whether he was sane. That rule states

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

FED. R. EVID. 704(b). The "mental state or condition" offered as a "defense" to the "crime charged" was Diekhoff's sanity. And deciding whether Diekhoff was sane involved examining whether, "as a result of a severe mental disease or defect, [he] was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). Thus, Diekhoff argues, when Dr. Stribling passed along his statement that he "knew [the kidnapping] was wrong," this constituted an "expert witness . . . stat[ing] an opinion or inference as to whether" he was sane at the time, violating Federal Rule of Evidence 704(b). We do not accept this argument.

We are careful not to flyspeck the district court's exercise of its discretion in admitting evidence and so we "will only overturn such rulings for a clear abuse of that discretion." *United States v. Reno*, 992 F.2d 739, 742 (7th Cir. 1993). When a psychiatrist testifies as to her assessment of the defendant's sanity, she must toe the line

between providing insight into the defendant's mental state and actually indicating whether she thinks the defendant is insane. This is because "[t]he purpose of Rule 704(b) is to have jurors decide whether the defendant was sane or not without being told what conclusion an expert might draw." *United States v. West*, 962 F.3d 1243, 1247 (7th Cir. 1992). So the expert can set out her "[m]edical and psychological knowledge" regarding the "mental disease or defect" that may affect the defendant because this information "help[s] the jury understand mental illness and its symptoms and effects." *Reno*, 992 F.2d at 742; *United States v. Brown*, 32 F.3d 236, 239 (7th Cir. 1994); *see also* FED. R. EVID. 702. But she cannot say or give an obvious inference that she thinks that the mental illness clouded the defendant's ability to distinguish right from wrong. *West*, 962 F.2d at 1246. This kind of testimony would involve a legal conclusion (or more accurately a fact-law conclusion), and experts cannot make those.

The issue here is whether Dr. Stribling "state[d] an opinion or inference" about Diekhoff's mental state at the time of the kidnapping. At the outset, it is clear that Dr. Stribling was not "stat[ing] an opinion" during the disputed portions of her testimony. Instead, she was relaying Diekhoff's statement to her about the crime. And these facts included an admission that he knew what he was doing was wrong. Although this observation was probative of the ultimate issue, it did not result from Dr. Stribling's expertise or the application of her technical knowledge to the facts of the case. *United States v. Romero*, 189 F.3d 576, 586 (7th Cir. 1999) ("His testimony did not amount to a statement of his belief about what specifically was going through [the defendant's] mind . . . ."). It was thus not her "opinion."

Diekhoff argues next that Dr. Stribling's statement was sufficient to raise an "inference" that he knew right from wrong. This is certainly the case. A sane person would say that he knew right from wrong, and Dr. Stribling testified that Diekhoff had said as much. But this is not the kind of "inference" that Rule 704(b) prohibits. An expert's testimony frequently gives rise to "inferences" that bear on the ultimate issue. Otherwise, it is doubtful that the expert's testimony would be helpful to the jury. *United States v. Foster*, 939 F.2d 445, 454 (7th Cir. 1991). And an expert can even "suggest[ ] . . . inferences that embrace an ultimate issue." *Brown*, 7 F.3d at 651. But to fall within Rule 704(b)'s prohibition, the testimony must give rise to an obvious "inference" regarding the expert's "opinion" as to the ultimate issue, not an "inference" with respect to the defendant's "mental state." That is, it must be a round-about effort by the expert to impermissibly express her "opinion."

Here, Dr. Stribling testified: Diekhoff said "I knew it was wrong." There was no embellishment to this statement indicating whether Dr. Stribling thought this showed sanity or insanity. Although one can infer that this is the statement of a sane person, such an inference stems from a general understanding about how the world works—not Dr. Stribling's expertise or the fact that one could clearly infer her opinion as to Diekhoff's sanity from this statement. Finally, although Diekhoff's statement to Dr. Stribling was certainly prejudicial, it was not unduly so. FED. R. EVID. 403. It is difficult to imagine a more probative statement of a defendant's sanity than his own admission that he "knew [committing the crime] was wrong." *See Ewing*, 494 F.3d at 616 ("[C]ertain evidence in the record indicating the defendant knew

his conduct was illegal was properly considered on the issue of whether he was able to appreciate its wrongfulness."). And the prejudice from this statement was not unfair because it would not have led the jury to conclude that he was sane for an illegitimate reason. Accordingly, the district court did not abuse its discretion in allowing the testimony.

### C.  Jury Instructions

Finally, Diekhoff challenges the district court's denial of his requested jury instruction regarding the consequences should the jury find him guilty but insane. That instruction would have told the jury that "The Court will commit the Defendant to a suitable facility until he is eligible for release under the law." Here, on appeal, Diekhoff repeats the claims that he made below and that the district court rejected. Specifically, he claims that Dr. Stribling's testimony as to Diekhoff's opinion regarding the penological consequences of his actions—"I don't know how long I will be in prison" and "They could just give me time served"—prejudiced him. In his estimation, a jury could have mistakenly inferred from this statement that he would go free if they found him insane. Taken to its logical conclusion, this inference could have shaded the jury's assessment of his insanity claim; better to keep an insane person in custody than to encounter him on the streets if he would be set free after trial.

We review de novo a district court's decision to allow or deny a requested jury instruction. *United States v. Waagner*, 319 F.3d 962, 966 (7th Cir. 2003). The requested jury instruction Diekhoff gave below is a restatement of

18 U.S.C. § 4243, which provides that those found to be insane "shall be committed to a suitable facility until such time as he is eligible for release." As a general matter, "juries are not to consider the consequences of their verdicts," like the kind of facility that will house the defendant following trial. *Shannon v. United States*, 512 U.S. 573, 579 (7th Cir. 1994). The jury's finding of facts and application of those facts to the law just do not require it to ponder what the ultimate sentence will be. *Id.* But this general rule has an exception where there is a danger that the jury has been misled regarding the consequences of its verdict. Thus, if "a witness or prosecutor states in the presence of the jury that a particular defendant would 'go free' if found [insane] it may be necessary for the district court to intervene with an instruction to counter such a misstatement." *Id.* at 587. Righting the course for a misled jury is a fact-bound endeavor, and, accordingly, "[t]he appropriate response . . . will vary as is necessary to remedy the specific misstatement or error." *Id.*

Here, the statement read by Dr. Stribling came during her cross-examination by Diekhoff's lawyer, nestled in the middle of a longer statement concerning the crime itself. The issue is whether this statement was sufficient to mislead the jury. Three considerations convince us that it was not. The first is the person making the statement. This was not the case of a prosecutor telling the jurors that a defendant would "go laughing out that door" if found insane. *Cf. Aliwoli v. Carter*, 225 F.3d 826, 830 (7th Cir. 2000). Nor did the witness herself suggest that, in her opinion, the defendant would get a windfall from a finding of insanity. *Shannon*, 512 U.S. at 587. Instead, the witness read her notes recounting a statement made by

the defendant regarding potential punishments, which included getting "time served." And she said this only after the defendant's attorney asked her to read notes containing the statement. A jury would not connect the defendant's statement to a psychiatrist to its role in the trial itself. Second, the statement did not say anything suggesting that a finding of insanity would result in "time served." When read in context, Diekhoff was opining about the possible legal effect of his actions, not the jury's decision regarding his sanity. Finally, the statement was simply too indirect to mislead, buried among the witness's notes and Diekhoff's discussion of the crime. The jury saw the haystack, not the needle Diekhoff claims was buried in there. For these reasons, the district court was right to deny the instruction, and we thus affirm.

### III. Conclusion

For the foregoing reasons, we AFFIRM Diekhoff's convictions and sentence.