In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-2026

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JASPER VARGAS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 CR 20007—**Michael P. McCuskey**, *Chief Judge.*

ARGUED OCTOBER 29, 2008—DECIDED DECEMBER 31, 2008

Before POSNER, MANION, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge.* Defendant Jasper Vargas was arrested on November 20, 2004, after police and federal agents discovered 282 kilograms of cocaine concealed within a hidden compartment in the refrigerated trailer that Vargas was using to haul produce. The government sought to introduce evidence at trial that Vargas had, on prior occasions, transported drugs hidden under loads

of produce in refrigerated semi-trailers.[1] The district court admitted the evidence under Federal Rule of Evidence 404(b) over Vargas's objection, and on January 31, 2007, the jury convicted Vargas of knowingly possessing more than five kilograms of cocaine with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii). The district court denied Vargas's motions for a judgment of acquittal and for a new trial, and sentenced him to life in prison. Vargas appeals the district court's admission of his prior uncharged drug trafficking activity. We affirm.

## I. BACKGROUND

On November 17, 2004, agents from the Drug Enforcement Administration in McCallen, Texas, began conducting surveillance on a refrigerated trailer that they believed would be used to transport drugs to Chicago. The agents first spotted the trailer on a residential street in Alton, Texas, a small town about ten miles north of the Mexican-American border. That afternoon, DEA agents observed Vargas and another individual, Juan Jose Garcia, arrive at the location and connect the trailer to a new tractor. Vargas then drove away with Garcia as a passenger. The agents followed, but when Vargas made a sudden U-turn they turned off the road to avoid being seen.

---

[1] Loads of produce used to conceal contraband are termed "cover loads" of produce.

The agents resumed following Vargas approximately forty-five minutes later. Vargas continued to make several U-turns on small country roads, and the agents suspected that he was conducting counter-surveillance to determine whether he was being followed. Vargas eventually parked at a small roadside restaurant where another individual worked on the refrigeration unit of the trailer. After the work was completed, Vargas drove away.

Later that day, Officer Hector Mendez, a local canine officer, stopped Vargas and the tractor-trailer at the request of DEA agents. Vargas told Mendez the trailer was to be loaded with produce the next day for a delivery to Georgia. After obtaining Vargas's consent, Mendez used his dog to search the interior of the empty trailer. The dog did not react, and Mendez did not find any drugs. Mendez gave Vargas a warning for speeding, and the DEA agents ceased their surveillance.

The next day, November 18, 2004, Vargas picked up a load of produce in Mission, Texas, destined for Karisu Produce in Chicago. Neither the DEA nor local enforcement was conducting surveillance at the time the trailer was loaded.

On the morning of November 20, 2004, Illinois State Trooper Robert Williams received an alert to "be on the look out" for the tractor-trailer, which bore the name "G&R Trucking." The alert identified Vargas as the anticipated driver. Officer Williams spotted the trailer and pulled Vargas over for speeding. According to Officer Williams, Vargas, who was accompanied by an unauthorized female

passenger, looked extremely nervous and was visibly shaking. Vargas provided Williams with the bill of lading, which showed that Vargas had picked up a load of produce in Mission, Texas, and was transporting it to Chicago.

After Williams completed a safety inspection and issued Vargas warnings for speeding and having an unauthorized passenger, he asked Vargas if he could search the trailer. Vargas consented to the search. Williams noticed that some rivets had been replaced on the passenger side of the front of the trailer under the refrigeration unit. He also noticed some nonstandard white caulk on the walls of the refrigeration unit, which indicated to him that it had been altered or modified.

With the assistance of other officers, Williams continued to search the trailer and noticed missing rivets and fresh black caulk on the outside of the trailer. Because of these observations, Williams requested that a drug canine come to the scene. The canine officer walked around the trailer, and the dog detected the presence of drugs. Williams entered the trailer, but was unable to examine the inside of the front of the trailer because of the load of produce.

Officers instructed Vargas to drive the tractor-trailer to the Illinois Department of Transportation yard in Ashkum, Illinois, where the police continued the search. Trooper Michael Banach, who had taken over the investigation, made his way through the load of produce and removed the external cover to the refrigeration unit, but he was unable to remove a second piece of sheet metal. The officers determined that the contents of the

trailer needed to be removed to allow for a thorough inspection, but they were unable to do so in Ashkum. At the officers' direction, Vargas drove to Kochel's Towing in Monee, Illinois, where the produce could be unloaded and the trailer fully inspected.

After the officers were finally able to remove the produce and several layers of sheet metal from the refrigeration unit, they discovered a hidden compartment containing 157 numbered bundles wrapped in green cellophane. Later investigation revealed that the bundles contained 282 kilograms of "very high purity" cocaine with a wholesale value of over $5 million. Vargas was placed under arrest.

Before trial, the government filed a "Second Notice of Introduction of Evidence Under Federal Rule 404(b)," indicating that it planned to present evidence of other instances in which Vargas was involved in transporting drugs concealed under cover loads of produce in refrigerated semi-trailers. The government summarized the evidence and explained that it was offered to show "whether the defendant possessed the cocaine 'knowingly.'" Vargas opposed the evidence. Although he conceded that it was relevant to knowledge and that it was similar enough to be relevant, he argued that the probative value of the evidence was outweighed by its danger of unfair prejudice.

The district court allowed the admission of the evidence. In a written opinion, the court found that the evidence was relevant to the issue of knowledge, that it was similar and close enough in time to be relevant, and

that it was sufficient to support a jury finding that Vargas committed the acts. The district court further found that the probative value of the evidence was not outweighed by the danger of unfair prejudice, because the evidence was "very relevant to the issue of [Vargas's] knowledge." The court noted that the risk of unfair prejudice could be mitigated by a limiting instruction to the jury that it could consider the "other acts" evidence only on the question of Vargas's knowledge.

During Vargas's trial,[2] the government called various law enforcement officers to testify to the events set forth above. The government also presented the testimony of Natris Morris, who had shared a jail unit with Vargas while they were awaiting trial. Morris testified that Vargas had admitted that he was transporting cocaine in a hidden compartment of a trailer when he was caught. Morris stated that Vargas had expected to be paid between $500 and $1,000 per kilo for transporting the drugs.

Pursuant to the district court's ruling, the government called three witnesses—Mario Martinez, Juan Mendoza, and Officer Alfredo Barrera—to testify to Vargas's other acts. Martinez, a long-time friend of Vargas, testified that in November 2002, Martinez brokered a marijuana

---

[2] Vargas's first trial, which began on January 16, 2007, ended in a mistrial when the jury hopelessly deadlocked at eleven to one for conviction. A second trial began on January 29, 2007. Because the second trial resulted in Vargas's conviction and is at issue on appeal, we will discuss only the evidence presented at this trial.

delivery for Francisco Arizmendi-Lugo (nicknamed "Pancho"), whom Vargas had introduced to Martinez. Martinez testified that he, Pancho, and Vargas had met at Martinez's ranch in Alton, Texas, to arrange the sale and transportation of fifty-five pounds of marijuana to Cutberto Sandoval in Corpus Christi, Texas. On the day of the sale, Vargas transported the marijuana to Corpus Christi in a refrigerated trailer under a cover load of produce. Martinez and Pancho traveled separately to Corpus Christi, where they met Vargas and Sandoval at an interstate truck stop. Vargas then drove the truck to a different location, where Sandoval took possession of the marijuana. Sandoval purchased the marijuana for $400 per pound, and Pancho paid Martinez $25 for each pound transported.

Juan Mendoza and Officer Barrera testified regarding the transport of a large amount of marijuana in 2003. On January 11, 2003, police officers in southern Texas stopped a tractor-trailer driven by Elio Longoria and carrying Juan Mendoza as a passenger. Barrera, an officer with the Texas Department of Safety, testified that he conducted a search of the refrigerated trailer and found 1,300 pounds of marijuana in bundles hidden in boxes of cabbage. Mendoza and Longoria were arrested.

Mendoza testified that the marijuana seized on January 11, 2003, was destined for Fort Wayne, Indiana. Mendoza explained that Vargas had obtained the tractor-trailer and the two of them had loaded the marijuana and cabbage into the tractor the day before the seizure. Mendoza estimated that he and Vargas would have been

paid between $6,000 and $7,000 for their roles in the delivery. Mendoza also testified that a few months before his arrest, he and Vargas had used the same tractor-trailer to transport 200 pounds of marijuana, concealed in produce, from Texas to an unspecified location "up north."

Vargas requested that the district court read a limiting instruction to the jury concerning the Rule 404(b) evidence. Pursuant to Vargas's request, the district court told the jury:

> You have heard evidence of acts of the defendant other than those charged in the indictment. You may consider this evidence only on the question of knowledge. You should consider the evidence only for this limited purpose.

The jury found Vargas guilty, and the district court sentenced him to life imprisonment.

## II. ANALYSIS

Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b); *United States v. Diekhoff*, 535 F.3d 611, 617 (7th Cir. 2008). Such evidence is admissible, however, where admitted for purposes other than showing propensity, such as to establish intent, knowledge, lack of mistake, motive, or opportunity. Fed. R. Evid. 404(b); *United States v. Chavis*, 429 F.3d 662, 667 (7th Cir. 2005). In determining whether to admit "other acts" evidence under Rule 404(b), courts are to examine whether:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice.

*Diekhoff*, 535 F.3d at 617.

We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Price*, 516 F.3d 597, 603 (7th Cir. 2008). We give special deference to the trial judge regarding these matters because of his first-hand exposure to witnesses, familiarity with the case, and ability to gauge the impact of the evidence in the context of the entire proceeding. *United States v. Hicks*, 368 F.3d 801, 807 (7th Cir. 2004). Only where no reasonable person could take the view adopted by the trial court will we reverse an evidentiary ruling. *Id.*

Vargas argues that the district court abused its discretion in admitting evidence of his prior involvement in drug transportation. Specifically, he argues that the evidence is not probative of his knowledge, that it is not similar enough to be relevant, and that the danger of unfair prejudice from admitting the evidence outweighs its probative value. We discuss each argument in turn.

Vargas first argues that the government did not meet its burden of demonstrating how the "other acts" evidence

established that Vargas had knowledge that the trailer contained cocaine. He correctly notes that this circuit has rejected a *per se* rule that all prior drug convictions are admissible to show knowledge and intent. *See United States v. Beasley*, 809 F.2d 1273, 1278 (7th Cir. 1987) ("A rule that a judge may admit all evidence that the defendant committed crimes of similar varieties produces the gravest risk of offending the central prohibition of Rule 404(b)."). We are not convinced, however, that the government failed to show how the evidence in this case was relevant to Vargas's knowledge that the trailer contained drugs.

This court has repeatedly held that when a defendant claims to be merely an "innocent bystander," evidence of prior drug convictions is relevant to show that the defendant knew that he was distributing drugs. *See, e.g., Chavis*, 429 F.3d at 668; *United States v. Smith*, 995 F.2d 662, 672 (7th Cir. 1993). For example, in *Smith*, the defendant claimed that he was unaware that he had hauled marijuana from Louisiana to Colorado. 995 F.2d at 671-72. The court held that evidence that the defendant had "picked up" a previous load of marijuana was relevant to establishing his knowledge and intent to distribute marijuana as charged. *Id.* at 672. Similarly, in *United States v. Moore*, 531 F.3d 496, 499-500 (7th Cir. 2008), we held that evidence of a prior drug buy was admissible to show that the defendant knew that a bag he threw from a vehicle contained drugs.

Vargas's prior involvement in drug distribution was likewise relevant to his knowledge in this case. Vargas concedes that his sole argument at trial was that he was

unaware that the trailer contained a secret compartment in which drugs were stowed. The fact that Vargas had, on previous occasions, hauled marijuana in refrigerated trailers containing produce makes it more likely that he knew the trailer contained drugs and less likely that he was an innocent victim.

As the crux of his argument that the prior bad acts were not relevant to establish knowledge, Vargas contends that the prior acts were not similar enough to the charged crime. Vargas argues that although these acts were similar in some respects, they were not similar in a way that shows knowledge. Namely, Vargas maintains that the evidence had little bearing on Vargas's knowledge that the trailer contained a hidden compartment.

We have repeatedly held in the context of Rule 404(b) that "similarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent. . . . *The prior acts need not be duplicates of the one for which the defendant is now being tried*." *United States v. Lloyd*, 71 F.3d 1256, 1265 (7th Cir. 1995) (alteration in original) (quotation omitted). This test is not unduly rigid, and the term "similarity" has been loosely inter- preted and applied. *United States v. Montani*, 204 F.3d 761, 768 (7th Cir. 2000). Thus, we analyze whether the prior conduct is similar enough on a case-by-case basis, a determination that "depend[s] on the theory that makes the evidence admissible." *United States v. Wheeler*, 540 F.3d 683, 692 (7th Cir. 2008) (alteration in original) (quota- tion omitted).

Vargas's prior involvement in transporting drugs under cover loads of produce was certainly similar enough to

produce an inference of criminal intent. The government's theory was that Vargas was aware that refrigerated trailers and produce are commonly used to transport drugs. Although the previous instances did not involve the use of hidden compartments, this distinction is not substantial enough for us to overturn the district court's decision. Vargas's prior bad acts certainly show that he was familiar with the technique of using cover loads of produce and refrigerated trailers. The jury could have easily believed that because Vargas had previously participated in this type of drug-hauling activity, it was more likely that he knew that the trailer he was hauling contained contraband.

Yet Vargas goes so far as to ask us to adopt a *per se* rule that "standard operating procedures" of drug dealers alone cannot establish sufficient similarity to be probative of knowledge under Rule 404(b). For this, Vargas relies upon *United States v. Owens*, 424 F.3d 649 (7th Cir. 2005). In *Owens*, we held that evidence of a prior bank robbery was not admissible to demonstrate the defendant's knowledge, namely his familiarity with the bank that he robbed in the charged incident. *Id.* at 655. After ruling that knowledge was not in issue in the case, we noted that, at any rate, "the evidence of the [prior] robbery does not demonstrate any *special* knowledge of the bank used to commit the present crime. While both . . . robberies were committed in substantially the same way, in that both involved the use of a demand note, the same may be said of most all bank robberies." *Id.* Thus, we held that the probative value of the evidence was low. *Id.*

*Owens* provides no support for a *per se* rule that prior bad acts involving only "standard operating procedures" cannot meet the threshold requirements of Rule 404(b). First, unlike in this case, we found it significant in *Owens* that knowledge was in no way at issue. *Id.* Furthermore, *Owens* never established that because using a demand note was a relatively standard procedure for bank robberies it could not be considered in a similarity analysis; indeed, we did not hold that the acts were too dissimilar to be relevant. *See id.* Instead, we merely noted that this *particular* common procedure did not have sufficient probative value in demonstrating the defendant's familiarity with the bank he was charged with robbing. *Id.* The evidence in Vargas's case, on the other hand, is extremely probative in that it *does* demonstrate his familiarity with the use of cover loads of produce and refrigerated trailers to transport drugs.

If we were to adopt Vargas's proposed rule that something beyond the "standard operating procedures" of drug dealers is required to show similarity, the government would be hard-pressed to find *any* evidence that would be admissible under Rule 404(b) in drug cases. Yet this type of evidence is often crucial to the government's case because the only way to ascertain the defendant's mental state is often to draw inferences from his prior conduct. *See Huddleston v. United States*, 485 U.S. 681, 685 (1988). This is precisely why Rule 404(b) allows such evidence to be admitted when it is probative of knowledge. Thus, whether Vargas's prior bad acts involved only "standard operating procedures" of drug dealers is irrelevant. What matters is that the evidence was

directed toward establishing Vargas's knowledge, and was sufficiently similar to the charged offense to be probative on that issue.

Even Vargas conceded in the district court that the government met these two prongs of our test. In his brief to the district court,[3] Vargas explicitly noted that "[t]he prior similar drug transactions sought to be introduced by the Government here are very similar to the crime at bar." Instead, Vargas's sole argument at the district court level was that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. We now turn to this argument.

Under Rule 404(b), evidence of a defendant's prior bad acts is not admissible where its probative value is substantially outweighed by the risk of unfair prejudice. *Diekhoff*, 535 F.3d at 617. We have noted that "most relevant evidence is, by its very nature, prejudicial, and that evidence must be *unfairly* prejudicial to be excluded." *United States v. Pulido*, 69 F.3d 192, 201 (7th Cir. 1995). Evidence is unfairly prejudicial if it will induce the jury to decide the case on an improper basis, such as propensity. *Old Chief v. United States*, 519 U.S. 172, 180-81 (1997). "[T]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will

---

[3] The brief in which Vargas made this argument is entitled "Response to Government's Second Notice of Introduction of Evidence under Federal Rule of Evidence 404(b)." However, because Vargas requested in that brief that the district court bar the evidence, the court treated it as a motion *in limine* to exclude the government's proffered evidence.

be received only if the risk of prejudice is more remote." *United States v. Menzer*, 29 F.3d 1223, 1234 (7th Cir. 1994) (alteration in original) (quotation omitted).

As noted above, the evidence of Vargas's prior involvement in drug transportation was probative of his knowledge of the use of cover loads of produce and refrigerated trailers to haul drugs. Knowledge that the refrigerated trailer contained drugs was not only an element of the crime, but the focus of Vargas's defense. *Cf. Moore*, 531 F.3d at 500 (relying, in part, on the fact that lack of knowledge was the focus of the defense in admitting evidence under Rule 404(b)). It is true that the evidence was slightly less probative than it would have been had it involved the use of hidden compartments. However, the risk of unfair prejudice was slight, and therefore did not substantially outweigh the probative value of the evidence to establish Vargas's knowledge.

The district court explicitly instructed the jury that it could consider Vargas's prior bad acts only on the question of knowledge, and as we have often noted, we assume that limiting instructions are effective in reducing or eliminating unfair prejudice. *See id.*; *United States v. Denberg*, 212 F.3d 987, 994 (7th Cir. 2000). Vargas claims that the district court's "formulaic" limiting instruction "left the jury out to sea" because it failed to explain how Vargas's prior bad acts were relevant to the issue of knowledge. (Petr.'s Br. 46-48 (citing *United States v. Jones*, 455 F.3d 800, 811 (7th Cir. 2006) (Easterbrook, J., concurring)).) This argument is unavailing. First, we have often held that similar or identical jury instructions,

modeled after pattern instruction 3.04 of this circuit, were effective in removing prejudice. *See, e.g.*, *Jones*, 455 F.3d at 809; *United States v. Puckett*, 405 F.3d 589, 599 (7th Cir. 2005). Second, the prosecutor explained to the jury how Vargas's bad acts were relevant in his opening statement by clarifying that the testimony would "shed light on the defendant's knowledge of the use of refrigerated tractor-trailers and cover loads of produce to transport large amounts of contraband." Thus, the jury was explicitly told how to consider the evidence.

Furthermore, any unfair prejudicial value of the evidence was mitigated by the fact that it was "a drop in the fairly large bucket of evidence" of Vargas's involvement in drug trafficking. *United States v. Coleman*, 179 F.3d 1056, 1062 (7th Cir. 1999). Vargas repeatedly engaged in evasive driving maneuvers while the truck was empty, which the jury could interpret as an effort to avoid leading law enforcement to the location where the drugs were to be loaded. Furthermore, he acted nervous and was visibly shaking when pulled over for speeding. Finally, he admitted to Morris, his cellmate after arrest, that he was caught transporting drugs, and that he had expected to be paid between $500 and $1,000 per kilo for his efforts. With 282 kilograms of cocaine in the trailer, that means Vargas would have been paid between $141,000 and $282,000 for this delivery. Considering this payment scheme, it is simply impossible that Vargas believed he was merely transporting produce. With a record replete with evidence of Vargas's guilt, any prejudice was relatively harmless and did not substantially outweigh its probative value. *See id.*

### III. CONCLUSION

We therefore find that the district court did not abuse its discretion in admitting the evidence of Vargas's prior bad acts under Rule 404(b). The evidence was directed at showing that Vargas knew the trailer contained drugs, and it was sufficiently similar to be relevant. The risk of unfair prejudice was minimal because it was mitigated by the district court's use of limiting instructions and the extensive evidence of Vargas's guilt; this minimal risk did not substantially outweigh the probative value of the evidence. The judgment of the district court is AFFIRMED.