UNITED STATES of America

v.

**Larry P. BRADSHAW, Appellant.**

**No. 90–3105.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 16, 1991.

Decided June 7, 1991.

Susan L. Coskey, appointed by the Court, with whom Richard G. Taranto was on the brief, Washington, D.C., for appellant.

Shanlon Wu, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Thomas C. Black, Craig S. Iscoe, and Kathleen M. O'Connor were on the brief, Washington, D.C., for appellee.

Before MIKVA, Chief Judge, WALD and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellant Larry Bradshaw was convicted of one count of bank robbery and one count of attempted bank robbery. He was sentenced to 210 months. He challenges his convictions and sentence on several grounds. We find merit in one claim—that the district court admitted incriminating statements made by Bradshaw without determining whether his waiver of *Miranda* rights was knowing and intelligent—and, therefore, remand for that determination. On all other issues, we affirm the convictions and the sentence.

## I.

Bradshaw has a long history both of bank robberies and of mental illness. He first began showing symptoms of what was later diagnosed as schizophrenia in the late 1970's. By the early 1980's his condition became acute. After his condition intensified, Bradshaw robbed a bank in Montreal and attempted to rob one in Miami.[1] In 1986, the Veterans Administration initiated proceedings at the instigation of Bradshaw's family to have him committed as an incompetent. Before these proceedings concluded, however, Bradshaw disappeared. He was not heard from again until he was arrested later in the year in the District of Columbia for bank robbery. After a year of commitment and treatment with medication, Bradshaw was deemed competent to stand trial and pled guilty; he was sent by the court to the mental health division of a federal correctional facility. He was released seven months later and placed on probation on the condition that he seek continued treatment.

Bradshaw visited the VA Hospital, where a doctor prescribed intravenous medication. The hospital mailed the medication to Bradshaw, along with a self-injection kit, but Bradshaw was unable to determine how to administer it, and his health again deteriorated.

The events giving rise to the convictions on appeal occurred on January 9, 1989. Bradshaw testified that he began drinking heavily that morning and had consumed over a liter of liquor by afternoon. Early that afternoon, he entered a bank and demanded money from a teller and a manager. Each refused to give him any money (they were stationed behind bulletproof glass); instead, they activated the silent alarm system. Bradshaw pounded repeatedly on the glass but eventually left the bank.

One hour later, Bradshaw entered a second bank, where he proved superficially more successful. He told a teller to give him money and not to move or he would kill her. The teller gave Bradshaw approximately $6,000 in a bag, but the bag also included an explosive dye pack. The dye pack exploded shortly after Bradshaw left the bank, covering him with red dye. He was apprehended only a few blocks from the bank.

The police arrested Bradshaw and told him his *Miranda* rights both orally and in writing. He asked questions concerning his rights (the officers and Bradshaw disagree as to what he asked; their conflicting versions are discussed more fully *infra* at 300), and signed a form waiving them. He then gave a statement admitting that he committed the second robbery because he "just needed some money ... [and] did something foolish." He further admitted in the statement, contrary to his later testimony, that he was not drunk.

Before trial, Bradshaw moved to suppress this confession, arguing that as a result of his mental illness and the enormous amount of alcohol he claimed to have consumed he was unable knowingly and intelligently to waive his *Miranda* rights, and that his statement to the police was accordingly inadmissible. The district court denied the motion, apparently on the assumption that a waiver of *Miranda* rights is invalid only if caused by police coercion.

At trial, Bradshaw admitted to committing the acts charged and relied entirely on an insanity defense. Defense counsel sought to establish Bradshaw's insanity through expert testimony based in part on Bradshaw's past commitments but requested that the prosecution be prevented from cross-examination concerning the reason (the prior robberies) for the commitments. The prosecution objected and the court concluded that it would permit cross-examination on that issue. Defense counsel then asked the expert about Bradshaw's prior convictions on direct examination.

The jury reported itself unable to reach a verdict, but after an *Allen* charge found Bradshaw guilty of both attempted robbery and robbery. The district court found Bradshaw to be a career offender as defined by the sentencing guidelines and de-

1. He also forged a check in Seattle and fraudulently obtained airline tickets.

termined a sentencing range under the guidelines of 210–262 months. It then denied Bradshaw's motion for a downward departure and sentenced him to 210 months.

## II.

Bradshaw argues that the district court erroneously admitted the statements he made to the police after his arrest. He does not dispute that before he incriminated himself the police advised him of his *Miranda* rights and that he signed a form waiving those rights. He nonetheless maintains that the waiver was ineffective and his statements should therefore have been suppressed.

*Miranda* itself provided that a defendant's statements can be used against him if he "voluntarily, knowingly and intelligently" waives his rights. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Whether such a waiver occurred has generally been thought to depend on two "distinct" questions: was the waiver "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was it "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). Only if both questions are answered affirmatively "may a court properly conclude that the *Miranda* rights have been waived." *Id.*

Bradshaw insists that the answer to each question is in the negative. He first claims that his waiver was not made with "full awareness," *i.e.*, was not knowing and intelligent, because he was unable due to mental illness and extreme intoxication to understand either his rights or the consequence of waiving them. He also argues that his waiver was involuntary under *Edwards v. Arizona*, in which the Supreme Court held that when an individual is given *Miranda* warnings and requests an attorney, any further police-initiated questioning before counsel is provided is *per se* coercive, *see Minnick v. Mississippi*, —— U.S. ——, 111 S.Ct. 486, 489–90, 112 L.Ed.2d 489 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). We will address each contention in turn.

### A.

■ As the government now concedes (Br. at 25 n. 12), the question whether a *Miranda* waiver was knowing and intelligent traditionally has embraced concerns apart from police activity, including whether the defendant was too mentally ill to understand the warnings, *see, e.g., United States v. Gaddy*, 894 F.2d 1307, 1312 (11th Cir.1990). At the suppression hearing, however, the government argued in response to Bradshaw's claim that his waiver was not knowing and intelligent that, under the Supreme Court's decision in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), an accused's statement cannot be suppressed as the product of a non-knowing waiver of *Miranda* rights unless there is evidence of police coercion. The district court apparently adopted the government's position. The court observed that Bradshaw "probably ... had been drinking" and that he "conceivably was not as mentally stable as he should have been." The district judge did not, however, make any explicit finding as to Bradshaw's capacity to understand his rights. Instead, the court considered only whether Bradshaw's waiver was *voluntary*, observed that *Connelly* held that police coercion is a necessary predicate for finding a waiver involuntary, and, finding no coercion, denied the motion to suppress.

We think that the government and the district court misread the *Connelly* case. Connelly was a schizophrenic who claimed he was driven by the "voice of God" to waive his *Miranda* rights and to confess to a murder. 479 U.S. at 161, 107 S.Ct. at 518. Unlike appellant here, he did not maintain that he did not comprehend his rights. Indeed, all the evidence indicated the contrary; Connelly himself stated to the officers that he understood the warnings and a psychiatrist testified that al-

though Connelly's schizophrenia interfered with his volitional abilities, it did not significantly impair his cognitive functions. *See id.* at 160–61, 107 S.Ct. at 518. Connelly instead emphasized the extent to which his mental illness left him incapable of exercising "free will" and "rational intellect." *Id.* at 159, 162, 170, 107 S.Ct. at 518, 519, 523.

Connelly's principal argument was that his confession was involuntary within the meaning of the due process clause. That provision of the Constitution requires that a confession be voluntary quite apart from whether or not *Miranda*'s prophylactic procedures are followed. A confession is inadmissible as a matter of due process if under the totality of circumstances it was involuntarily obtained (for example, if the police beat a confession out of an individual after he validly waives his *Miranda* rights). *See, e.g., Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985); *United States v. Yunis,* 859 F.2d 953, 961 (D.C.Cir.1988). Connelly also argued that he was incapable of effectively waiving his *Miranda* rights.

The Supreme Court discussed the due process issue at length. It held that a confession is not constitutionally involuntary unless it is precipitated in some way by *police* coercion, for there cannot be a due process violation unless there is some form of state action. *See id.* at 163–67, 107 S.Ct. at 519–21. As the coercive forces behind Connelly's actions were supplied by his own mental imbalance rather than by the state, the Court concluded that admission of his confession did not transgress due process notions. *See id.* at 166–67, 107 S.Ct. at 521.

The Court treated the *Miranda* issue more briefly. It noted at the outset that "[o]f course, a waiver must *at a minimum* be voluntary to be effective." *Id.* at 169, 107 S.Ct. at 523 (quotation omitted and emphasis added). It then held that the "'voluntariness' inquiry" in the *Miranda* waiver context turns on the same factor— police coercion—as does the due process voluntariness standard, and that Connelly's *Miranda* waiver was accordingly voluntary. *Id.* at 169–70, 107 S.Ct. at 523. Sig-

nificantly, however, for our purposes, the Court concluded with a limited disclaimer:

> It is possible to read the opinion of the Supreme Court of Colorado as finding respondent's *Miranda* waiver invalid *on other grounds.* Even if that is the case, however, we nonetheless reverse the judgment in its entirety because of our belief that the Supreme Court of Colorado's analysis was influenced by its mistaken view of "voluntariness".... *Reconsideration of other issues,* not inconsistent with our opinion, is of course open to the Supreme Court of Colorado on remand.

*Id.* at 171 n. 4, 107 S.Ct. at 524 n. 4 (emphasis added).

We read *Connelly,* therefore, as holding only that police coercion is a necessary prerequisite to a determination that a waiver was *involuntary* and not as bearing on the separate question whether the waiver was knowing and intelligent. Connelly's claims, as noted above, were clearly directed only towards the voluntariness of his actions; the knowledge test was not involved in the case. And there is no other way to explain the Supreme Court's disclaimer: aside from the knowledge inquiry, there are no "other grounds" on which the lower court's ruling could have been based, and if police coercion were the focus of that inquiry as well, the lower court would be unable to "reconsider[ ]" anything. *See Derrick v. Peterson,* 924 F.2d 813, 820–21 (9th Cir.1990).

To be sure, some of the reasoning in the section of *Connelly* dealing with the due process voluntariness standard could be applicable to our case as well. The Court, for example, observed that evidence should not be excluded unless suppression would deter future constitutional violations, *see* 479 U.S. at 166, 107 S.Ct. at 521. Since the police may not know whether an individual does not or cannot understand *Miranda* warnings (the government claims here that the police were not aware of Bradshaw's illness), an argument could be made that in those circumstances deterrence is inapposite. And as the Ninth Circuit observed, there is some tension between *Connelly*'s

holding that a confession is not involuntary under the due process clause unless there is state action in the form of police misconduct and invalidating a waiver of *Miranda* solely on the basis on a confessant's state of mind because "the constitutional provision underlying the *Miranda* warning—the fifth amendment—is applied to the states through that same [due process clause]." *Derrick*, 924 F.2d at 820–21.

But any doubts we might have concerning *Connelly*'s reach dissipate in light of the Court's subsequent decision in *Colorado v. Spring*, in which it reiterated that:

> The inquiry whether a waiver [of *Miranda*] is coerced has "two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 [106 S.Ct. 1135, 1141, 89 L.Ed.2d 410] (1986): First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. . . . Ibid.*

479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987) (emphasis added). We agree with the Ninth Circuit that this statement dispels any notion that a *Miranda* waiver must be caused by police misconduct to be deemed non-knowing. *See Derrick*, 924 F.2d at 820–21; *see also Miller v. Dugger*, 838 F.2d 1530, 1538 (11th Cir.), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988).

The district court thus erred in apparently deeming Bradshaw's mental capability irrelevant to the validity of his waiver of *Miranda* rights. Because the district court made no finding with respect to Bradshaw's understanding of his rights, we remand for this determination.

### B.

■ Bradshaw's claim that admission of his statement violated *Edwards v. Arizona* centers on his testimony at the suppression hearing that he asked for counsel several times before signing the waiver form, but that the officers responded "we are not going to let you make a call at the present time, but, first of all, we are ... going to want this particular statement [the waiver] signed ... beforehand." The interrogating officer, however, had a different account:

> [Bradshaw] asked if he had the access to, or the option of speaking to, an attorney; and I told him that he did. I asked him if he wanted to stop the interview, and he said that he did not. He just wanted to ... be sure that if he chose to speak to an attorney, he would have the opportunity.

The district court did not determine which version was correct.

Unlike his argument concerning his unknowing waiver, Bradshaw did not raise the *Edwards* issue below, and we therefore review his claim only for plain error. *See* FED.R.CRIM.P. 52(b). Plain error will be found only if defects affecting "substantial rights" were "obvious or readily apparent." *United States v. Young*, 470 U.S. 1, 16–17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985); *see also United States v. Blackwell*, 694 F.2d 1325, 1341–43 (D.C.Cir.1982); *United States v. Lewis*, 693 F.2d 189, 193 (D.C.Cir.1982). Appellant cannot meet this exacting standard.

If Bradshaw's version of events—that he made an unambiguous request for counsel—were undisputed, it might well have been plain error for the district court not to recognize the *Edwards* issue and suppress his subsequent statements. But as we have already noted, the police testified that Bradshaw's request was ambiguous and that they responded to it only insofar as necessary to see if he actually did want an attorney. Before finding an *Edwards* violation on the basis of Bradshaw's testimony, the district court would thus have first needed to determine whether to credit it. Surely an error cannot be "plain" or "readily apparent" when under another version of events no error may have been committed at all, and the district court did not resolve and was not asked to resolve the conflict in testimony. Perhaps in recognition of this problem, Bradshaw argues in his reply brief that it was plain error for

the district court not to decide which account was accurate. In a pre-trial hearing, however, there are often conflicts of testimony on collateral issues. Unless counsel brings to the court's attention the legal significance of the testimonial conflict, it is hard to see why the district court's obligation to resolve the conflict is "plain."

The district court would also have committed plain error if *Edwards* prohibits the police from responding to an ambiguous request for counsel (the police's version) by asking questions to see if the defendant actually wants an attorney. But it is an open question in this jurisdiction whether the police may respond in this way to an ambiguous request for counsel (though a majority of other courts have ruled that they may, *see, e.g., Smith v. Illinois,* 469 U.S. 91, 96 n. 3, 105 S.Ct. 490, 493 n. 3, 83 L.Ed.2d 488 (1984) (per curiam); *Bruni v. Lewis,* 847 F.2d 561, 563 (9th Cir.), *cert. denied,* 488 U.S. 960, 109 S.Ct. 403, 102 L.Ed.2d 391 (1988)). The district court would thus have had to address this legal issue and adopt the minority position in order to suppress Bradshaw's statements. We therefore cannot say that any defect was plain. *Cf. Blackwell,* 694 F.2d at 1342 ("[T]he lack of prior precedent in the circuit ... militate[s] against calling the judge's mistake plain error.").

### III.

Bradshaw challenges the district court's admission of evidence of his prior convictions for bank robbery, attempted armed robbery, forgery, and fraud. Prior convictions are admissible to show state of mind, *see* Fed.R.Evid. 404(b), unless their "probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. Bradshaw does not dispute that his prior convictions were relevant to his state of mind and thus admissible under Rule 404(b). His insanity defense turned in large part on whether he appreciated the wrongfulness of his actions, *see* 18 U.S.C. § 17(a), and his prior convictions (and punishment) for almost identical conduct clearly bore on this question. Rather, he contends that the district

court failed to evaluate on the record whether the probative value of the convictions was "substantially outweighed by the danger of unfair prejudice" to his insanity defense, and that we must therefore remand the case for this determination, *see, e.g., United States v. Lavelle,* 751 F.2d 1266, 1279 (D.C.Cir.) (the district court's Rule 403 balance generally must appear on the record), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985). We disagree.

At trial, defense counsel wished to put on expert testimony concerning Bradshaw's history of mental health commitments but sought to preclude cross-examination on the convictions which accompanied those commitments. The prosecution objected, arguing that it was entitled to question a defense expert testifying as to Bradshaw's appreciation of the wrongfulness of his actions on all matters bearing on that issue. The district court agreed with the prosecution that a psychiatrist so testifying "has to know the full story.... And that story not only includes the commitments, but the reasons why he was committed." Defense counsel then complained that allowing introduction of prior convictions would prejudice Bradshaw's insanity defense, to which the court responded: "I will be perfectly frank with you. I think that is an action that cuts both ways. I am going to permit it."

Although "[t]he trial judge has the responsibility for making sure that the record reflects the balancing of the considerations articulated in Rule 403," *United States v. Foskey,* 636 F.2d 517, 525 n. 7 (D.C.Cir. 1980), we do not "require a mechanical recitation of Rule 403's formula on the record as a prerequisite to admitting evidence under Rule 404(b). As long as it appears from the record as a whole that the trial judge adequately weighed the probative value and prejudicial effect ..., we conclude that the demands of Rule 403 have been met." *United States v. Sangrey,* 586 F.2d 1312, 1315 (9th Cir.1978); *accord United States v. Ramirez,* 894 F.2d 565, 569–70 (2d Cir.1990); *United States v. Lewis,* 780 F.2d 1140, 1142 (4th Cir.1986); *United States v. Sliker,* 751 F.2d 477, 487

(2d Cir.1984) (Friendly, J.), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832, 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 697 (1985); *United States v. Hyman,* 741 F.2d 906, 913 (7th Cir.1984).

The admission of prior convictions where sanity is the only issue presents different considerations than does the admission of like evidence in the typical case where the *actus reus* is contested. The probativeness, to begin with, is generally unquestionable—the insanity defense directly puts state of mind at issue, and a prior criminal record for similar acts is highly relevant to the basis for and the reliability of witnesses' testimony about the defendant's appreciation of the unacceptability of his conduct. *See, e.g., United States v. Ruster,* 712 F.2d 409, 412 (9th Cir.1983); *United States v. Hall,* 583 F.2d 1288, 1291–92 n. 1 (5th Cir.1978); *Rogers v. United States,* 483 A.2d 277, 289 (D.C.App.1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985). There is, moreover, no risk of the primary prejudicial effect of prior convictions, that the jury will "prejudge [a defendant's] guilt on the basis of his past criminal record, because [the defendant does] not deny commission of the act." *Rogers,* 483 A.2d at 288.[2] Finally, there is the possibility that an extensive criminal record will prove prejudicial *to the government* by permitting the inference that the defendant is insane either because he cannot appreciate the nature of his acts or because he continues to commit the same crime for which he has consistently been punished in the same easily-detectable way. As the D.C. Court of Appeals has pointed out, *defendants* in insanity cases often seek to introduce their criminal records for just this reason. *See id.* at 289 (citing cases).

This is not to say that Rule 403 does not come into play when the prosecution seeks to introduce evidence of past crimes in an insanity case. It is rather to recognize that the balancing the district court is called upon to perform is not as simple as in a typical case. The probative value side of the balance will more frequently be obvious and the danger of prejudicial effect will be harder to identify, particularly as any possible prejudice to the defense must be discounted by the potential for the evidence actually to aid it.

Admittedly, the court's ruling was terse and approaches the point at which it would be impossible for us reliably to ascertain the basis for his ruling. It does appear to us, however, from the "record as a whole" that the district judge adequately considered the factors we deem relevant to the 403 inquiry. He seems to have assessed both the probativeness ("A psychiatrist has to know the full story") and the prejudicial effect to Bradshaw and/or the government ("I think this is an action that cuts both ways."). The cases relied upon by Bradshaw, in contrast, are ones in which the district court flatly refused to express its views on the matter, *see United States v. Manner,* 887 F.2d 317, 323 n. 3 (D.C.Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); *Foskey,* 636 F.2d at 525 n. 7 (court "acquiesced" in government's theory of admissibility without comment). We find no basis for a remand simply because the district court did not explicitly state: "I therefore believe the probative value of the convictions outweighs the danger of unfair prejudice."

### IV.

■ Bradshaw's last challenge concerns his sentence. The sentencing guidelines provide that a person convicted of a felony considered a crime of violence who has at least two prior felony convictions for crimes of violence be sentenced as a "career offender," *United States Sentencing Guidelines* § 4B1.1, and the commentary

---

**2.** Thus, Bradshaw argues that the introduction of his criminal record prejudiced him not by influencing the jury to prejudge his guilt but by focusing the jury's attention *on his future dangerousness* and the resulting need to confine him. Although we have said that the "danger that the evidence will inflame the jury" is part of the Rule 403 inquiry, *Lavelle,* 751 F.2d at 1278, we do not see why admission of Bradshaw's prior convictions influenced the jury in this way substantially more than his own failure to contest that he in fact committed the crime with which he was charged.

designates robbery as a crime of violence, *see* Commentary to § 4B1.2. As Bradshaw had two prior convictions for robbery or attempted robbery, the district court sentenced him as a career offender; this designation increased Bradshaw's guidelines range from 63–78 months to 210–262 months.

Defense counsel conceded at the sentencing hearing that Bradshaw "is by the definition of the statute [a career offender]"; he nonetheless asked the district court to depart from the guidelines on two bases. First, he requested a downward adjustment to his sentence pursuant to guidelines § 5K2.13, which permits a decreased sentence if a defendant "committed a non-violent offense while suffering from significantly reduced mental capacity ... provided that the defendant's criminal history does not indicate a need for incarceration to protect the public." The district court found that this section did not justify a downward departure on "at least two grounds." Second, defense counsel invoked the general departure section (§ 5K2.0), which permits decreased sentences if the district court finds that there is a mitigating circumstance not taken into account by the Sentencing Commission in setting the guidelines range. The district court did not discuss this argument, and sentenced Bradshaw to 210 months, the lowest sentence within the career offender range for Bradshaw's offense.

Bradshaw now contends that it was error for the district court to fail to determine whether his prior robberies were actually crimes of violence justifying a career offender designation. He correctly notes that we have held that district courts have the discretion in applying the career offender provisions of the guidelines to determine that particular prior offenses were not in fact crimes of violence even if in general those offenses are violent and are listed as such by the commentary. *See United States v. Baskin*, 886 F.2d 383, 389–90 (D.C.Cir.1989), *cert. denied*, ── U.S. ──, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990). In *Baskin*, however, we remanded for the district judge to make this determination because the record indicated that he failed to do so in the first place only as he "apparently believed [erroneously] that he did not have discretion to review the facts and depart from the guidelines [on the ground that the defendant's previous convictions were not for crimes of violence] but that if he could he would." 886 F.2d at 389. Here, there is absolutely no indication that the district court failed to review the facts surrounding Bradshaw's previous offenses out of an incorrect view of its power to depart from the guidelines; it did not do so simply because it was not *asked* to by defense counsel. *Baskin* did not create an affirmative obligation on the district courts to conduct this inquiry even in the absence of a request. As with all other issues, in order to preserve for appeal an argument for departure from the guidelines, a defendant must press that specific argument before the district court. *See, e.g., United States v. Visman*, 919 F.2d 1390, 1393–94 (9th Cir.1990).

\* \* \* \* \* \*

We remand to the district court for a determination whether Bradshaw knowingly and intelligently waived his *Miranda* rights.

*It is so ordered.*