NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0860n.06

No. 08-3712

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Dec 20, 2011*

LEONARD GREEN, Clerk

DAVID WOODLEY,                                         )
                                                      )        ON APPEAL FROM THE
        Petitioner-Appellant,                         )        UNITED STATES DISTRICT
                                                      )        COURT FOR THE
v.                                                    )        NORTHERN DISTRICT OF
                                                      )        OHIO
MARGARET BRADSHAW, Warden,                            )
                                                      )               O P I N I O N
        Respondent-Appellee.                          )


BEFORE:    DAUGHTREY, MOORE, and McKEAGUE, Circuit Judges.

   **McKeague, Circuit Judge.**  Petitioner David Woodley appeals the district court's denial of

his petition for habeas corpus.  Petitioner contends that the state court violated his federal

constitutional rights when it denied him a psychiatric exam despite substantial indicia that he was

(1) insane at the time of the alleged offenses, (2) incompetent to stand trial, and (3) incapable of

giving a voluntary statement to the police.  Because Petitioner has failed to show that the state court

decision was either contrary to or an unreasonable application of clearly established Supreme Court

precedent, we **AFFIRM** the denial of habeas relief.

## I.  BACKGROUND

### A.  Factual Background

        On May 15, 2001, Petitioner was arrested in East Cleveland for crimes involving sexual

activity with two girls under the age of 13.  Upon police questioning, he made a confession.  On May

17, Petitioner consented to a police search of his home. There, police discovered incriminating books and articles on child pornography.

On August 22, Petitioner, though counsel, filed a motion for a psychiatric examination to determine his competency to stand trial and his sanity at the time of the alleged offenses. On September 10, 2001, the Cuyahoga County Court of Common Pleas held a hearing at which defense counsel expressed his concerns about Woodley's mental condition and his inability to cooperate in trial preparation. The court questioned Petitioner and, finding him lucid and able to consult with counsel, denied the motion. On October 9, Petitioner filed another motion for a psychiatric evaluation, this time in connection with a motion to suppress his confession and the search of his home. On October 23, the court held a hearing where counsel again presented his concerns about Petitioner's mental capacity. The court questioned Petitioner and decided to proceed with the suppression hearing without a psychiatric evaluation. After hearing testimony from one of the interrogating officers, the court determined that Petitioner's confession and consent to search were knowing, intelligent and voluntary, and, further, that Petitioner displayed no sign of insanity or incapacity. The court denied the motion to suppress and the request for a mental examination.

Petitioner proceeded to jury trial on November 5, 2001 on eight counts: four counts of gross sexual imposition of a person under the age of 13 (counts one through four); two counts of rape of a person under the age of 13, with force or threat of force (counts five and six); one count of kidnapping a person under the age of 13 with specification for sexual motivation (count seven); and one count of importuning a person under the age of 13 (count eight). The jury found Petitioner guilty

of all charges except kidnapping.[1] The trial court sentenced Petitioner to three years for each counts one, two, three and four, life imprisonment for each counts five and six, and nine months imprisonment as to count eight, all counts to run consecutively.

## B. Procedural History

On direct appeal, the Ohio Court of Appeals affirmed Petitioner's conviction but remanded for the limited purpose of notifying Petitioner of his mandatory post-release control. *State v. Woodley*, No. 80732, 2003 WL 1900935 at *13 (Ohio Ct. App. April 17, 2003). The Ohio Supreme Court denied review. *State v. Woodley*, 797 N.E.2d 92 (Ohio 2003). On January 6, 2005, Petitioner filed a habeas petition in the Northern District of Ohio, asserting two grounds for relief. First, Petitioner contended that the state court violated his federal Fifth, Sixth, and Fourteenth Amendment rights to due process and fair trial when it denied a psychiatric exam despite substantial indicia that he was (1) insane at the time of the alleged offenses, (2) incompetent to stand trial, and (3) incapable of giving a voluntary statement to the police. Second, Petitioner contended that the evidence was insufficient to support a conviction of forcible rape. On May 12, 2008, the district court, adopting a magistrate judge's report and recommendation, denied relief and declined to grant a certificate of appealability ("COA"). *Woodley v. Bradshaw*, No. 1:05 CV 0028, 2008 WL 2048209 (N.D. Ohio May 12, 2008) (unpublished). This Court granted a COA on Petitioner's first ground for relief.

---

[1] The facts of the trial are adequately set out in the opinion of the Ohio Court of Appeals at *State v. Woodley*, No. 80732, 2003 WL 1900935 (Ohio Ct. App. April 17, 2003), and reproduced in the district court's opinion at *Woodley v. Bradshaw*, No. 1:05 CV 0028, 2008 WL 2048209 (N.D. Ohio May 12, 2008) (unpublished).

## C. Pretrial Hearings

The state trial court inquired into Petitioner's mental condition on two occasions. At the first

hearing on September 10, 2001, counsel expressed the following concerns:

> COUNSEL: I filed a written motion August 22nd, after . . . noticing a significant, I think very apparent, thought disorder . . . . Mr. Woodley is prone to giving very short, repeated, almost rhythmic answers, saying the same statement over and over again, without giving me any help for pretrial preparation. He's said over and over and over again that time or death means nothing to him. And any question I ask him about the trial, or trial strategy, or anything of the sort, that's the answer I get, 'Time and death mean nothing to me.' Over and over again, he will respond he wants to arrive at the truth. Again, repeatedly, rhythmically.
>
> COURT: That's an admirable quality.
>
> COUNSEL: Certainly, it is, Judge. But, on the other hand, I can't get past the—have official conversation.
> . . .
>
> COUNSEL: In terms of cooperating in trial preparation, all he will say and do is what you have to, nothing more. He doesn't want me to call any witnesses. He won't discuss it. I can't do anything with him.

Counsel also informed the court that Woodley had not been institutionalized or under mental

health treatment in the past; Woodley's mother suffered from psychiatric problems; Woodley's sister

recently experienced the same problems communicating with him, where he would give only

repetitive answers instead of engaging in conversation; and, Woodley was displaying depressive and

possibly suicidal behavior.

The court then engaged Woodley directly. Woodley informed the court that he was a high

school graduate, had been employed in the past, and was adjusting well to the jail setting, attending

Bible study and reading the paper. He also indicated that he was able to take the advice of his

attorney:

> COURT: Mr. Woodley, are you able to talk to your attorney about . . . what you
> remember of anything, or whether it happened, or didn't happen, that type of thing?
> That's what defendants and attorneys normally talk about. Have you ever been able
> to have those conversations with your attorney?
>
> DEFENDANT: Yes, I have. And I told him the truth.
> …
>
> COURT: Okay. Are you in a position to take advice and appreciate advice, and give
> the consideration it deserves?
>
> DEFENDANT: Yes, I can. And I thanked him for that. He's been very helpful with
> me.
>
> COURT: He's a very well-respected attorney. Do you recognize him as a good
> attorney?
>
> DEFENDANT: Yes, I do. Very much so. I don't have nothing bad to say about
> him. You know, he's been really good support to me. I understand he's looking for
> my best interest. We're kind of contemporary in age, and so forth. I feel I have to
> arrive at this truth, and I want to thank him before you, personally.

The court then denied the motion for a psychiatric exam but ordered that Petitioner be put on suicide

watch at the jail.

The court held a second hearing on October 23, 2001, in connection with defense counsel's

second motion for a psychiatric exam to determine whether Petitioner had the capacity to make a

voluntary, knowing, and intelligent confession to the police and validly consent to a search of his

home. Defense counsel again raised substantial concerns about the Petitioner's mental capacity:

> COUNSEL: I filed this motion because it's my feeling and assessment after multiple
> conversations with my client that he has some serious flaws in his reasoning ability.
> I legitimately feel his capacity to make intelligent and knowing decisions is in serious

doubt. As a result, I think it's almost an understatement to say if his statement comes in, it's devastating to the defense. I think there is a serious problem with his mental capacity. I discussed this with him.

. . .

He has basically ordered me to withdraw the motions. He wants the statements to come in even though he says the statements do not contain the truth. He wants the evidence to come in which of course to my way of thinking as a defense lawyer for 25 years makes absolutely no sense whatsoever.

The court again engaged Petitioner in a colloquy, explaining the seriousness of the charges against him, the possible penalty of life imprisonment, the mechanics of a trial, and the incriminating nature of his confession to the police. After each explanation, the court asked Petitioner whether he understood the explanation just given. In each case, Petitioner responded affirmatively. Petitioner admitted he made the statements to the police but claimed they were false and that he said them because the police told him what to say. When the court asked Petitioner why he wanted the statement in if it wasn't true, Petitioner responded that he was not ashamed of presenting the statement in court because he would explain that it was false. When the trial court asked Petitioner if he would follow his counsel's advice about pursuing suppression, he indicated he would.

Defense counsel then interjected, pointing out that Petitioner's mental issue was characterized by an indiscriminate compliance to authority, without understanding the nature or consequences of his actions:

COUNSEL: If I may, Judge, despite what he told me earlier in no uncertain times [sic] he's now willing to take my advice, but if we could take a side step, I think he's just illustrated the nature at least in part why I think there is such a problem because he's basically telling you, excuse me here, but he's telling you what he thinks you want to hear which is part of the problem I've had with this whole thing. It's part of the problem I have with the statement. It's part of the problem I have with dealing

with him. I don't think he really understands what's going on here. He's trying to please you as he did last time when we were out here on the record on my motion to refer him for a psychiatric examination. He did the same thing then. He told you how wonderful I was and all these pleasant things. I don't know why he thinks I'm so wonderful. I'm telling the guy he'll go to jail for the rest of his life. The pieces don't fit together here. Again this morning the same thing happened. He ordered me to withdraw this motion, that he wanted it in evidence and to please you and in five minutes he completely changes his mind. This is what I'm dealing with and why I'm having such a hard time with this case. I think the guy has a mental problem. I'd like to have somebody take a look at it and tell me if I'm out in left field or I'm right. I don't know what to do here. I don't know how to protect his interest. Now he says he wants it out. He told me he wanted it in. He would be extremely angry with me if I try to keep it out.

Defense counsel also noted that Petitioner told him that jail conditions at the East Cleveland jail were wonderful and that he was perfectly fine and comfortable out there.

The court reflected that the mere fact that Petitioner gave a confession did not indicate insanity and, even if he just said whatever the police told him to say, that also would not indicate insanity. The court went over the basics of trial with Petitioner, and Petitioner demonstrated he understood the process. When asked whether he would call any witnesses, Petitioner stated he "[felt] that's unnecessary" because his "evidence [would] speak for themselves [sic]." The court asked whether Petitioner had a history of odd behavior such as "shoveling snow on the roof or singing . . . on the street," and defense counsel stated no.

The court decided to proceed with the motion to suppress even though defense counsel objected that without a psychiatric evaluation on Petitioner's mental capacity, "this is a total exercise in futility," noting that the argument was not that the statement was involuntary but that Petitioner did not have the capacity to make a knowing and intelligent decision. The court continued to express doubt as to whether Petitioner was seriously mentally ill, saying "there is nothing insane about what

he's saying, there is nothing insane about lying, there is nothing insane about escaping responsibility. This is normal. This is what people do." Counsel responded that he agreed with the court as a general statement but emphasized that all he was asking for at that point was to have Petitioner examined, to determine whether he was "out in left field" or had a viable argument on mental capacity. The court decided to proceed with the suppression hearing but stated it would keep an open mind as to counsel's dilemma.

Testimony from one of the interrogating police officers established that police did not use aggressive interrogation techniques, officers made no threats or promises, Petitioner signed and initialed a written waiver, and Petitioner appeared to be very attentive during the interrogation and cooperated in giving a full confession. When asked by the court whether anything unusual about Petitioner's behavior stood out during the interview, the officer responded:

> Well, I'm not a doctor but in my opinion I honestly feel he believed there was no problem with what he was doing. I believe that he felt genuine with her in regards to the way he was answering his questions and stuff. It was not like he was appalled or anything. He really appeared to be sorry, you know, at the end for getting caught and doing what he did.

The officer testified there was nothing unusual about Petitioner's behavior apart from the substance of his answers. The officer read aloud parts of the Petitioner's confession:

> Q: Why did you do these sexual acts with her knowing she was only eleven years old?
>
> A: I would say it was a fight between good and evil and to keep her from doing any further harm to herself that being the most important thing.
> …
>
> Q: How was she harming herself?

A: Because there were forces working against her. What I mean by that is the forces of evil. I'm just glad that she is all right now. I'm also glad that she did those things with me and no one else because they would be brutal with her.

. . .

Q: At what point did you know what you were doing to her was wrong?

A: I knew it was wrong and right at the same time. Right because she was with me and no one else. Wrong because of what I'm going through now.

Q: Is there anything else you wish to add to your statement?

A: Yes. I would like to say I have hugged and kissed other kids but never have I had sexual contact or sex with them like I have with Dominique. She was very special to me like Nolan was special to me . . . . What we know or understand. Only God knows. I believe that I have done the will of God and we can close with that.

At the end of the hearing, the court concluded:

The Court is convinced that he made a knowing, intelligent, voluntary statement to the police. He was honest, honest as a rapist could be, if these are true statements. Everything he said and everything that's attributed to him in this statement suggests it was a voluntary action. I heard the earlier suggestion or argument . . . that he was instructed what to say or he was saying what they wanted him to say. I don't think there is a police officer in America who would dream this one up. This is not something anybody could come up with. This is exactly how a pedophile thinks. Court makes a finding of fact that, I don't see any sign of incapacity or insanity here, any more than any other person who naturally has some issues, who is dealing with sex with children. I mean, we could put it in practical terms. Are they playing with a full deck? I don't think any rapist is playing with a full deck, the perfectly normal behavior, no. But, there is no sign of insanity or anything else here. This man logically made decisions and I find the police officers to be entirely credible and the police work to be fine . . . . I don't see a need for a referral for mental examination. We're still denying that, at this point.

## II. ANALYSIS

### A. Standard of Review

In a habeas proceeding, this Court reviews a district court's legal conclusions *de novo* and its factual findings for clear error. *Carter v. Mitchell*, 443 F.3d 517, 524 (6th Cir. 2006). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court may not grant a writ of habeas corpus on claims adjudicated on the merits in state court unless it concludes that the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court renders an adjudication "contrary to" clearly established federal law when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court renders an "unreasonable application" of clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "Factual findings made by the state court, or by state appellate courts based upon the trial record, are presumed to be correct but may be rebutted by clear and convincing evidence." *Biros v. Bagley*, 422 F.3d 379, 386 (6th Cir. 2005); 28 U.S.C. § 2254(e)(1).

**B. Sanity at the Time of the Offense**

Since the Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68 (1985), it has been clearly established that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Ake*, 470 U.S. at 74. The Court went on to note, however, that a "defendant's mental condition is not necessarily at issue in every criminal proceeding . . . and it is unlikely that psychiatric assistance of the kind we have described would be of probable value in cases where it is not. The risk of error from denial of such assistance, as well as its probable value, is most predictably at its height when the defendant's mental condition is seriously in question." *Id*. at 83.

The Ohio Supreme Court has held that "pursuant to *Ake* and its progeny, in order to establish a violation of due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, 'a defendant must show more than a mere possibility of assistance from an expert. Rather, a defendant must show a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial.'" *State v. Broom*, 533 N.E.2d 682, 691 (Ohio 1988) (quoting *Little v. Armontrout*, 835 F.2d 1240, 1244 (8th Cir. 1987)).

The state trial court here found no need for a mental examination. In *Ake* terms, the court found Petitioner did not make a preliminary showing that his sanity at the time of the offense was "seriously in question" and would likely be a significant factor at trial. The Ohio Court of Appeals affirmed that finding. Relying on *State v. Broom*'s requirement that a defendant must show a "reasonable probability that an expert would aid in his defense, and that denial of expert assistance

- 11 -

would result in an unfair trial," the appeals court found no abuse of discretion in the trial court's

determination. *Woodley*, 2003 WL 1900935 at *6. The appeals court also found persuasive the fact

that Petitioner did not enter a plea of not guilty by reason of insanity. *Id*.

Though the issue is close, we cannot find the state decision to be an objectively unreasonable

application of *Ake*. Post-*Ake*, the Supreme Court has not elaborated on what constitutes a threshold

showing beyond imposing the requirement that such a showing must be supported by particular facts,

not general allegations of need.[2] *Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003) (citing

*Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985)). Thus, we are guided only by the showing

found sufficient in *Ake* itself. There, Court found that defendant made a preliminary showing on the

following facts: (1) Ake's sole defense was that of insanity; (2) under state law, the initial burden

of producing evidence for insanity defense fell on the defendant; (3) Ake's behavior at his

arraignment, four months after the offense, was so bizarre the trial judge *sua sponte* ordered a

competency exam; (4) a state psychiatrist shortly thereafter found Ake to be incompetent to stand

trial; (5) when Ake was found to be competent six weeks later, it was only under large doses of an

anti-psychotic medication; and (6) psychiatrists who examined Ake for competency suggested that

Ake's mental issues may have begun years earlier. *Ake*, 470 U.S. at 86. On these facts, fundamental

---

[2]We disagree with the district court's conclusion that trial counsel did not allege specific facts in his requests for a psychiatric evaluation. *See Woodley*, 2008 WL 2048209 at *7. Trial counsel, in fact, gave specific examples of Petitioner's repeated, rhythmic statements and indiscriminate compliance to authority figures. That such alleged facts may be insufficient to grant habeas on the basis of *Ake* in this case does not render them unspecific.

fairness required the State to provide defendant with psychiatric assistance to prepare his defense.

*Id*. at 76.

Here, the record is not so developed, as the trial court refused to grant even an initial mental examination. But, at the two hearings described at length above, Petitioner was lucid, gave clear answers to the court, indicated his ability to consult with his counsel, and demonstrated understanding of the nature of the charges against him and the mechanics of trial. Further, Petitioner was a high school graduate, had been gainfully employed in the past, and was not on any psychiatric medication. He produced no evidence of a history of insanity, although counsel stated that his mother was mentally ill. And, Petitioner did not pursue a defense of insanity at trial but maintained his innocence, explaining that his confession was false.[3]

While Petitioner's statements to the police and his behavior described by counsel arguably show that his sanity might be a significant factor at trial, AEDPA does not authorize a federal court to grant habeas where the court believes a state court decision to be erroneous or incorrect; the state court decision must be an objectively unreasonable application of Supreme Court precedent. *McAdoo v. Elo*, 365 F.3d 487, 493 (6th Cir. 2004); *see also Rice v. Collins*, 546 U.S. 333, 341-42 ("Reasonable minds reviewing the record might disagree . . . but on habeas review that does not

---

[3]We note that the fact Petitioner did not enter an insanity plea is not dispositive either way; it is merely one of the many factors considered in *Ake*. Thus, Petitioner's argument that the denial of a psychiatric exam prevented him from investigating a potential insanity defense misses the mark. *Ake* does not require the State to provide access to psychiatric assistance any time a defendant believes he has a viable insanity defense; the obligation is triggered only upon making the threshold showing that his sanity at the time of the alleged offense is "seriously in question." *Ake*, 470 U.S. at 82-83. Nor do we believe that a defendant must enter a plea of insanity before the threshold showing can be satisfied.

suffice to supersede the trial court's credibility determination."); *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.") (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In light of the *Ake* factors that weigh against Petitioner, the state court decision was not objectively unreasonable.

## B. Competency to Stand Trial

It is well established that the conviction of an accused person who is legally incompetent to stand trial violates due process.  *Pate v. Robinson*, 383 U.S. 375, 378 (1966).  The standard governing competency was first set out in *Dusky v. United States*, 362 U.S. 402, 402 (1960): "[T]he test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him."  While the Supreme Court has noted that there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," *Drope v. Mississippi*, 420 U.S. 162, 180 (1975), the Court has explained that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required" and that "even one of these factors standing alone, may, in some circumstances, be sufficient," *id.* (construing *Pate*, 383 U.S. at 375).  A state court's "determination of competence is a factual finding, to which deference must be paid." *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006) (citing *Thompson v. Keohane*, 516 U.S. 99, 110-11) (1995)).

Where there is substantial evidence that a defendant is incompetent, a court must hold a proper competency hearing. *Pate*, 383 U.S at 385-86. Under Ohio law, state courts are required to hold a competency hearing if the issue is raised before trial.[4] The Ohio Court of Appeals found that the September 10, 2001 hearing was properly held in accordance with that statute. The appeals court also found no error in the trial court's finding of competence. *Woodley*, 2003 WL 1900935 at *4-6.

Petitioner, in addition to claiming that the state courts erred in finding him competent, contends that the hearings were not proper because they lacked input from a psychiatrist. This contention is without merit. Clearly established Supreme Court precedent does not require such input at a competency hearing, and under Ohio law, the decision to order a mental evaluation based on the evidence submitted at a competency hearing is left to the discretion of the trial court.[5] *See id.* at *4; O.R.C. § 2945.371(A) ("If the issue of a defendant's competence to stand trial is raised . . . , the court *may* order one or more evaluations of the defendant's present mental condition[.]") (emphasis added).

---

[4]Ohio Revised Code ("O.R.C.") § 2945.27(B) provides: "In a criminal action in a court of common pleas, a county court, or a municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section. If the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion."

[5]Of course, the trial court's discretionary determination must not run afoul of federal constitutional standards. *See Drope*, 420 U.S. at 174-75. Where a defendant makes the threshold *Ake* showing, the State must provide access to psychiatric help. *Ake*, 470 U.S. at 83. As Petitioner has not made that showing, he had no clearly established federal right to psychiatric input at his competency hearing.

As discussed above, Petitioner, at both hearings, demonstrated mental alertness. Most significantly, per the *Dusky* standard of competency, he demonstrated an understanding of the seriousness of the charges against him and indicated his ability to consult with his counsel.[6] The three factors identified by the Supreme Court to be relevant to competency—irrational behavior, demeanor, and prior medical opinion—all weigh in favor of finding Petitioner competent. Petitioner's demeanor was lucid, there was no evidence of a history of bizarre behavior, and no psychiatric medical history. While the Supreme Court has cautioned that "mental alertness and understanding displayed in . . . colloquies with the trial judge" does not justify "ignoring . . . uncontradicted testimony of [a defendant's] history of pronounced irrational behavior," *Pate*, 383 U.S. at 385-86, here there is no such history weighing against Petitioner's mental alertness at the hearings.

Weighing against a finding of competency was counsel's repeated concerns that Petitioner was giving "very short, repeated, almost rhythmic answers, saying the same statement over and over again, without giving [counsel] any help for pretrial preparation" and that Petitioner said things to please authority without understanding the nature or import of those statements. The trial court, however, did not observe any aberrant behavior or responses from Petitioner and found that he was

---

[6]The Ohio Court of Appeals reviewed the trial court's decision based solely on information adduced in the first hearing. Considering that the Supreme Court has held that a defendant may be entitled to a competency hearing even where he has not requested one, *Pate*, 383 U.S. at 384, and has cautioned that "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial," *Drope*, 420 U.S. at 181, it is appropriate to consider both hearings in analyzing Petitioner's claim. We have done so here.

competent. While the Supreme Court has said that defense counsel's expressed doubts about his client's competence "is unquestionably a factor which should be considered," *Drope*, 420 U.S. at 178 n.13, counsel's concerns in this case do not amount to the "clear and convincing" showing needed to rebut the state court finding of competence, 28 U.S.C. § 2254(e)(1).

It is, of course, troubling that Petitioner's alleged mental disturbance in this case is of a type that is not as visibly "insane" as other disorders. In such cases, the true extent of a defendant's mental impairment may remain undetected without the expertise of a psychiatrist. We echo the Supreme Court's encouragement to err on the side of caution in matters of competency and not to be chary in ordering psychiatric evaluations. *Drope*, 420 U.S. at 178 n.13 ("[R]esolution of the issue of competence to stand trial at an early date best serves both the interests of fairness and of sound judicial administration. Realization of those facts may have prompted the practice, noted by the sentencing court, 'of the Circuit Attorney at the time to consent in all cases to a psychiatric examination whether with or without merit and without looking into the matter further.'") (internal citations omitted). Even the state appellate court in this case stated that "[w]hile we do not find that the trial court committed error in denying the motion for psychiatric evaluation, we stress that discretion is not unfettered and the trial courts should err on the side of caution with regard to these motions." *Woodley*, 2003 WL 1900935 at *6. However, while granting an evaluation may well have been best practice, the state court's finding of competency was not an unreasonable determination of the facts on the evidence presented at the state court hearings, nor was it rebutted by clear and convincing evidence. *Cf. Eley v. Bagley*, 604 F.3d 958, 966 (6th Cir. 2010) (finding state court's failure to hold an evidentiary hearing on competency was reasonable where defendant was able to

recall his confession, testified cogently, and understood the objective at a suppression hearing and exhibited no indications of incompetency during the guilt and penalty phases of trial).

## C. Capacity to Give a Voluntary Statement to the Police

When an individual is taken into custody or otherwise deprived of his freedom by the authorities, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A defendant may waive such rights, provided any waiver is voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." *Id*. (internal citations omitted). Subsidiary factual questions in determining the voluntariness of a confession are subject to a presumption of correctness, but the ultimate question is a legal determination reviewed under § 2254(d)(1). *See Thompson v. Keohane*, 516 U.S. 99, 110-11 (1995); *Miller v. Fenton*, 474 U.S. 104, 112 (1985).

The state trial court held a suppression hearing at which it found that Petitioner "logically made decisions," the police officer's testimony was credible, and the "police work [was] fine." The

court explicitly found that Petitioner made a knowing, intelligent, and voluntary waiver. The Ohio Court of Appeals affirmed, finding that "in light of the totality of the circumstances and the evidence presented at the suppression hearing, we find no error in the trial court's denial of the appellant's motion to suppress." *Woodley*, 2003 WL 1900935 at *8.

First, Petitioner's statement was clearly not involuntary. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the due process clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). There was no indication that the police engaged in coercive tactics to obtain Petitioner's confession. At the suppression hearing, one of the officers who interrogated Petitioner stated that he gave Petitioner a written copy of his Miranda rights, Petitioner read aloud the rights one by one and initialed each paragraph, indicating that he understood what he had read, and Petitioner wrote "yes" and initialed the form where it asked whether, having those rights in mind, he wished to talk to the police. He then executed a signed, written waiver in the presence of two detectives, which form included the highest grade Petitioner had completed and whether he was under the influence of alcohol or drugs. Indeed, defense counsel acknowledged at the hearing, "[I]t's not a voluntaryism in that sense. It's in the sense of his capacity to make reasonable, knowing, intelligent decisions."

Second, the state court's determination that Petitioner's waiver was knowing and intelligent was not contrary to or an unreasonable application of clearly established Supreme Court precedent. The Supreme Court has explained that the validity of a waiver must be analyzed by looking to the totality of the circumstances surrounding the interrogation, which includes evaluation of the defendant's "age, experience, education, background, and intelligence, and into whether he has the

capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). However, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege," as long as he is advised of "the critical advice that whatever he chooses to say may be used as evidence against him." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

Beyond those general requirements, the Supreme Court has not further detailed what constitutes a knowing and intelligent waiver. We note that a circuit split has developed on whether the holding of *Connelly* applies to the knowing and intelligent inquiry as well as to the voluntariness one. Some circuits require evidence of police abuse—such as disregarding signs that a defendant is incapable of making a rational waiver in light of his age, experience, and background—as a necessary predicate to finding that a waiver was unknowing and unintelligent, and some analyze knowing and intelligent waiver simply by looking to whether the defendant had the maturity and competence to make a knowing waiver of his rights, regardless of what police knew or should have known. *Compare Rice v. Cooper*, 148 F.3d 747, 750-51 (7th Cir. 1998) (finding defendant made a knowing and intelligent waiver because there was no evidence of police abuse) *with United States v. Bradshaw*, 935 F.2d 295, 298-300 (D.C. Cir. 1991) ("We read *Connelly*, therefore, as holding only that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent."). This Court is of the former opinion. *Garner v. Mitchell*, 557 F.3d 257 (6th Cir. 2009) (en banc).

The state court judgment can be supported as a reasonable application of Supreme Court precedent under either interpretation. Under the first interpretation, Petitioner's waiver was clearly not a product of police abuse, as described above. Under the second interpretation, the record sufficiently indicates that Petitioner, in light of his age, education level, and demeanor during police questioning, understood the warnings, even if he did not fully appreciate the extent to which his statements could be incriminating. Further, even if Petitioner's waiver could be found valid under only the first interpretation, we could not find the state court's judgment objectively unreasonable, as the Supreme Court has not clearly spoken on the issue, federal circuit courts do not agree on the correct rule, and we are bound by our prior decision in *Garner*.

### III. CONCLUSION

For the reasons above, we **AFFIRM** the district court's denial of habeas relief.